2021 IL App (1st) 182112-U

THIRD DIVISION
March 31, 2021

No. 1-18-2112

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 12481 02 |
| | ) | |
| MARCEL WHITE, | ) | Honorable |
| | ) | William H. Hooks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the trial court's denial of defendant's motion for leave to file a successive postconviction petition where the affidavits supporting the petition failed to set forth a colorable claim of actual innocence.

¶ 2    Defendant, Marcel White, was convicted of the May 8, 2002, home invasion and first-degree murder of Brian Campbell, and was sentenced to consecutive terms of imprisonment of 50 years for first degree murder plus a 15-year firearm enhancement, and 10 years for home invasion. In this appeal, defendant challenges the denial of his motion for leave to file a successive postconviction petition. Defendant specifically claims that he made a colorable claim of actual

innocence based on the affidavits of two witnesses who would testify that they saw defendant

outside of the apartment building where Campbell was shot at the time of the shooting.

¶ 3    The facts elicited at trial were set out in the direct appeal. Because those facts are relevant

to this appeal, we repeat them below.

> "Defendant, James Mitchell and Christopher Peoples were charged with the May 2002 death of Campbell. Defendant was a member of the Gangster Disciples street gang. At trial, the State asserted that Peoples fired the weapon that killed Campbell, and, therefore, defendant was tried on an accountability theory, as Mitchell had been.
>
> The State's theory of prosecution was that Campbell was killed because he and his wife, Ninner Powers, angered defendant, Mitchell and Peoples by selling drugs for a members of a rival gang. Powers testified that on May 8, 2002, she and Campbell lived in a two-flat building at 826 West 50th Street in Chicago. At about 8:30 p.m., Powers concluded a conversation with a friend at her front door and was shutting and locking the door. Defendant, Mitchell and a third man, who was later identified as Peoples, pushed the door open and entered the vestibule at the foot of the stairs that led to the couple's second-floor apartment.
>
> Powers said she had known defendant, or 'Duke,' and Mitchell, or 'Pooh Butt,' for about 20 years. Powers did not know Peoples. Powers testified that Mitchell accused her of receiving money and a large quantity of drugs to sell for the rival gang, and Mitchell demanded the drugs and money from her. Powers replied to Mitchell that she did not make that arrangement with the rival gang because she was not at home the previous night; she had been in jail after an arrest for criminal trespass to a vehicle. Powers said she told the men that she did not have any drugs or money.
>
> During this confrontation, Powers and the men were walking upstairs to the apartment, and defendant said he was going to go upstairs and find the drugs himself. Defendant went to the top of the stairs, kicked the door open and entered the apartment. According to Powers, before defendant kicked the door in, defendant told Mitchell that he should 'go ahead and have [Powers] popped.' Mitchell then told Peoples to 'pop' her. Peoples pulled a gun from his coat and pointed it in Powers' direction. Campbell came to the door at the top of the stairs, and Peoples fired three or four shots at him, striking him in the chest and in each leg. Powers testified that after Peoples shot Campbell, Peoples put the gun to her head and pulled the trigger, but the gun was empty. Powers saw her husband's .38-caliber revolver on the floor nearby and took the weapon out of its case, at which point the three men ran downstairs.
>
> Police arrived at the apartment to investigate the shooting. Powers provided police with the nicknames and addresses of defendant and Mitchell, and she described Peoples to police. Powers later identified police photographs of all three men.

Antonio Rogers also testified for the State. Rogers admitted to a recent misdemeanor conviction for retail theft and also to a pending misdemeanor case. Rogers, who knew Powers, stated that on the night of the shooting, he and his cousin went to the home of 'Big Ken,' who lived across the street from Powers, to buy drugs with counterfeit money. On his way to Big Ken's, Rogers encountered defendant and Mitchell. Rogers knew both men and identified defendant in court. Rogers said defendant asked him if he was 'straight,' meaning did Rogers want to buy drugs. Even though Rogers intended to buy drugs, he told defendant he did not because he did not 'want [any] trouble' for giving defendant fake money because Rogers knew defendant was a Gangster Disciple.

As Rogers stood on the porch of Big Ken's house and waited for a response to his knock, Rogers saw defendant, Mitchell and a third person standing on Powers' porch across the street. Defendant, Mitchell and the third man went inside Powers' building, after which Rogers heard a gunshot. Defendant and Mitchell emerged from the building, and defendant said to Mitchell, 'Chris just shot dude' [*sic*]. Peoples then came out of the building, and defendant and Mitchell ran away from Peoples, who walked away from the building. Powers then came out, screaming that her husband had been shot. As Rogers walked away from the scene, he saw defendant and Mitchell return and speak to Powers and saw defendant leave in a car driven by his girlfriend.

Chicago Police Officer Brian Pratscher testified that he interviewed Powers at her apartment immediately after the shootings. In contrast to Powers' trial testimony that the men pushed the door open while she was closing it, Pratscher testified that Powers told him that the men knocked on the door and she went down the stairs to answer it. Cocaine was found in Powers' apartment.

Chicago Police Detective John Halloran testified that when he entered Powers' apartment to investigate the shooting, he observed Campbell's body on the floor with gunshot wounds to the chest, left thigh and right shin. The officer observed a total of three .25-caliber spent shell casings in the upstairs doorway of the apartment and the dining room, in addition to a .38-caliber revolver in the dining room. The revolver had not been fired.

Halloran and Chicago Police Detective Timothy Nolan interviewed defendant both with and without his attorney present. In the latter interview, defendant admitted going to Powers' house with Mitchell and Peoples to confront Powers but he denied entering the residence." *People v. White*, No. 1-06-01 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 4    The trial court additionally described the trial evidence regarding the two interviews of

defendant as follows:

"Halloran testified that his partner called defendant's counsel but the attorney did not call back. At about 9 p.m., Halloran and another detective spoke to defendant.

After advising defendant of his *Miranda* rights, which defendant indicated he understood, defendant said his nickname was Duke, that he was a Gangster

Disciple and a friend of Mitchell and that he knew Powers. When asked about the events of May 8, defendant said he and Mitchell were walking on Powers' block and passed her building. They saw Peoples (who defendant referred to as Chris) standing on Powers' porch. Defendant described Peoples as a heroin addict from the neighborhood. Defendant and Mitchell joined Peoples on the porch to 'help [him] get drugs at that location,' and one of the men knocked on Powers' door. Powers answered and allowed Peoples inside. Defendant and Mitchell remained on the porch. Shots were fired inside the building while he and Mitchell were outside, and when Peoples came out, the three men fled together.

At that point, Halloran told defendant that Powers had 'implicated him as taking a far more active role in the home invasion and murder' of Campbell. The detective told defendant that a witness saw the three men enter the building together. Defendant denied going inside. At that point, the police received a call from defendant's attorney.

\*\*\*

Halloran interviewed defendant again the next day with defendant's attorney present.

Defendant said he was a Gangster Disciple and sold drugs near Powers' house. Contrary to his previous statement, defendant said he, Mitchell and Peoples went to Powers' house together to confront Powers about selling drugs in the neighborhood. Halloran again told defendant that Powers and other witnesses had contradicted his statement. Defendant denied going inside Powers' building or participating in the shooting.

With his attorney present, defendant told police that he, Mitchell and Peoples went to Powers' house together to confront her about selling drugs in the area, in contrast to his earlier statement that he and Mitchell simply accompanied Peoples on his drug buy." *Id.*

¶ 5    Halloran further testified that after interviewing defendant, Halloran:

"showed Powers a photo array in which she identified Peoples as the man who fired the weapon.

The defense presented the stipulated evidence of Detective Nolan that he interviewed Rogers and that Rogers 'saw the guy was fiddling with something with his right hand in his right jacket pocket' and that 'it looked like the guy was trying to keep a gun from falling out of the coat pocket.' The jury was instructed on three theories of murder - intentional, knowing and felony murder - and on the offense of home invasion. The jury was provided with general verdict forms. At the close of evidence, the jury convicted defendant of first degree murder and home invasion. The jury also determined that a person for whom defendant was legally responsible was armed with a firearm." *Id.*

¶ 6    Thereafter, defendant was sentenced to consecutive terms of imprisonment of 50 years for first degree murder plus a 15-year firearm enhancement, and 10 years for home invasion.

¶ 7    On direct appeal, this court affirmed defendant's convictions and sentence over several challenges. In particular, defendant claimed that (1) the denial of his counsel's challenges to three potential jurors for cause denied him a fair trial; (2) the prosecution introduced improper evidence of his criminal record and made various improper remarks during closing argument; (3) his  trial counsel was ineffective for failing to move to suppress his statement made without his attorney present and also for not requesting separate jury verdicts for the alternate counts of murder in the indictment; (4) his 65-year sentence for murder was excessive; (5) the 15-year statutory sentence enhancement could not be applied in his case because he did not hold the weapon; and (6) he was entitled to a new trial because the jury was instructed on three theories of murder, including felony murder, and due to the use of general verdict forms, the jury could have convicted him on the theory of felony murder, of which home invasion is a lesser included offense. *Id.*

¶ 8    On April 7, 2010, defendant filed a *pro se* post-conviction petition, claiming ineffective assistance of trial and appellate counsel, and that the State used perjured testimony. On July 2, 2010, the trial court summarily dismissed the petition, finding it to be frivolous and patently without merit. Appointed appellate counsel filed a *Finley* motion to withdraw, which this court granted. *People v. White*, 2011 IL App (1st) 102471-U.

¶ 9    On March 30, 2018, defendant filed a *pro se* motion for leave to file a successive post-conviction petition, as well as the successive petition. The petition alleged: (1) actual innocence based on newly discovered evidence; and (2) that the State committed a *Brady* violation by failing to disclose that Antonio Rogers initially gave police a statement inconsistent with his trial testimony.

¶ 10    In support of defendant's motion, defendant presented the affidavits of two individuals, Ranceallen Hankerson and Antonio Rogers.

¶ 11    In Hankerson's affidavit, he attested that he had known defendant his whole life as they grew up in the same neighborhood, but they did not "hang out" with each other. Hankerson's uncle, Big-Ken, would sell drugs across the street from Powers's apartment building where defendant would also sell drugs. On May 8, 2002, from his front room window, Hankerson saw defendant and Mitchell standing across the street. Antonio Rogers knocked on Hankerson's door, but Hankerson did not answer because he knew Rogers was looking for drugs. Rogers came back a few minutes later and at that time, Hankerson saw two people come out of Powers's apartment. He then saw Powers let an unknown male inside the apartment and saw defendant immediately start walking west towards Peoria Street, followed by Rogers and Mitchell. After that, Hankerson saw the unknown male come out of the apartment building with a small, silver gun in his hand and head east toward Halsted Street. When Big-Ken came home, Hankerson told him what he saw, and Hankerson learned a week later that defendant had been arrested for Campbell's death. Big-Ken, who had previously been beaten up by defendant for dealing drugs, told Hankerson not to get involved or come forward because of what defendant had done to him in the past. Hankerson further averred that Big-Ken had since passed away and that knowing that defendant had been locked up for a crime he did not commit has been "weighing heavily" on Hankerson's heart and mind "over the years." Hankerson approached defendant's mother and provided the affidavit, and further stated that he was willing to testify.

¶ 12    Antonio Rogers's affidavit states that, in his interview with Detective Halloran and another detective, he told them that on the day that Campbell was shot and killed, he had been talking to defendant because defendant was trying to sell him drugs. Rogers was on Big Ken's porch when he saw a woman coming out of Powers's apartment and, a minute or so later, he saw a black male who he did not know enter Powers's apartment building. At the time, Rogers was outside with

6

White and Mitchell. At no time did Rogers see anyone other than this black male enter Powers's apartment. Rogers also averred that he began walking home as soon as he heard gunshots. As Rogers was walking away, defendant was walking west towards Peoria Street. Rogers stated that he told Halloran this information at his initial interview but had to change his story because Halloran said that Rogers was lying and that he would be charged with perjury. Rogers stated that he was addicted to drugs and did not want to go to jail, so he provided the story given to him by Halloran and made the false statement in which he placed defendant and Mitchell inside the apartment at the time of the murder. Rogers averred that he also testified falsely because he was afraid that Halloran would send him to jail if he "did not tell the false story [Halloran] gave" Rogers. Rogers further stated that after he testified, Rogers left Illinois for ten years and provided the affidavit to defendant's mother when he moved back.

¶ 13    On August 2, 2018, the trial court denied defendant leave to file his successive petition, finding that he failed to set forth a colorable claim of actual innocence and failed to demonstrate cause and prejudice to assert a *Brady* claim. Regarding defendant's actual innocence claim, the court concluded that his claim was "deficient on every element." The court noted that the "import" of both affidavits was that defendant "never went inside the building where Campbell was shot." This evidence, however, was not newly discovered since defendant already told the police that he did not go into the building and that codefendant Mitchell, who Rogers said was with defendant at the time, could have testified to the same thing. The trial court also found that defendant failed to show that he could not have discovered the evidence sooner through due diligence, since defendant offered no evidence that he attempted to contact Rogers before he provided the affidavit. The trial court then determined that the proposed evidence that defendant never entered the building was cumulative because the jury already heard testimony that defendant denied going into the building.

The trial court further concluded that the affidavits were not of such a conclusive character that they would likely change the result on retrial. Since defendant was convicted on an accountability theory and he voluntarily attached himself to a common design with Mitchell and Peoples to rob Powers, it did not matter if Peoples was the only person to enter the apartment.

¶ 14    Finally, regarding the alleged *Brady* violation, the trial court concluded that Rogers's affidavit was not material because defendant could not show that he was prejudiced by the State's failure to disclose Rogers's initial statement that defendant did not go inside the building. Having failed to show prejudice, defendant could not show cause and prejudice to raise such a claim, and accordingly, defendant's *Brady* claim also failed.

¶ 15    Defendant filed a timely notice of appeal from the court's denial of his motion for leave to file a successive postconviction petition.

¶ 16    In this court, defendant contends that he presented a colorable claim of actual innocence based on the affidavits of Hankerson and Rogers, who averred that he "never entered Powers's house where the shooting of Brian Campbell occurred."

¶ 17    As an initial matter, we note that defendant has raised no argument in this court regarding the second issue raised in his successive petition—that the State committed a *Brady* violation by allegedly failing to disclose Rogers's initial statement. Accordingly, defendant has abandoned that issue and forfeited it for review. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *People v. Guest*, 166 Ill. 2d 381, 414 (1995).

¶ 18    The Postconviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)) provides a statutory mechanism for a criminal defendant to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." *Id.* § 122-1(a)(1). The Act contemplates the

filing of only a single petition. *People v. Robinson*, 2020 IL 123849, ¶ 42; 725 ILCS 5/122-3 (West 2014) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."). Prior to filing a successive postconviction petition, a petitioner must obtain leave of the circuit court. *Robinson*, 2020 IL 123849, ¶ 43. The bar against a successive filing will be relaxed, and leave of court to file should be allowed, in two situations. First, a defendant may raise a constitutional claim by satisfying the cause-and-prejudice test. *Robinson*, 2020 IL 123849, ¶ 42; see also 725 ILCS 5/122-1(f) (West 2016). Second, even without showing cause and prejudice, a defendant may assert a claim of actual innocence pursuant to *People v. Washington*, 171 Ill. 2d 475 (1996). *Robinson*, 2020 IL 123849, ¶ 42 (citing *People v. Edwards*, 2012 IL 111711, ¶ 23). Our review of the circuit court's denial of a motion seeking leave to file a successive postconviction petition is *de novo. Robinson*, 2020 IL 123849, ¶ 39.

¶ 19     In this appeal, defendant raises only the second type of claim—actual innocence. To establish a claim of actual innocence, the supporting evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47 (citing *Edwards*, 2012 IL 111711, ¶ 32). A motion for leave to file a successive petition raising a claim of actual innocence should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. *Id.* ¶ 44 (citing *People v. Sanders*, 2016 IL 118123, ¶ 24). We therefore consider defendant's motion and the accompanying affidavits, "to ascertain whether he has raised the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* ¶ 44. Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* ¶ 48.

¶ 20 Initially, we seriously question whether the affidavits of Hankerson and Rogers may be considered newly discovered. Within the context of an actual innocence claim, "newly discovered evidence" means evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Id.* ¶ 47 (citing *Coleman*, 2013 IL 113307, ¶ 96).

¶ 21 Defendant contends that Hankerson's affidavit should be considered newly discovered because, in defendant's words, Hankerson indicated that he was "unwilling to come forward earlier because of familial pressure." Defendant similarly asserts that Rogers's affidavit is newly discovered and could not have been obtained earlier because Rogers lived outside of Illinois for ten years.

¶ 22 In this case, there is no evidence that defendant had ever previously attempted to contact Hankerson or Rogers, and due diligence assumes at least some effort by defendant to discover evidence. *Edwards*, 2012 IL 111711, ¶ 37. Although the affidavits generally recount the reasons why Hankerson and Rogers did not come forward sooner, the record is devoid of any evidence of efforts on defendant's part to obtain those affidavits prior to 2018, approximately 13 years after defendant's trial. Hankerson does not state in his affidavit that he was unavailable at any time prior to when he signed his affidavit in February 2018, and makes no other assertion that would allow this court to conclude that he would not have offered his affidavit earlier. Although Hankerson's affidavit suggests that he waited for Big-Ken to die before coming forward, he does not specify when that occurred.

¶ 23 In Rogers's affidavit, he asserts that he left Illinois and moved back ten years later. However, there is no indication when he left the state or when he returned, that he was actually unavailable while he was living out of the state, or that he would not have offered his affidavit

earlier had defendant attempted to find him. See *People v. Wingate*, 2015 IL App (5th) 130189, ¶¶ 27-28.

¶ 24    Nonetheless, even if we could find the affidavits to be newly discovered, defendant's proposed actual innocence claim otherwise fails.

¶ 25    Reduced to their essence, the affidavits supporting defendant's claim of actual innocence provide that defendant did not personally enter the apartment building where the victim was shot. In his affidavit, Rogers essentially repeats much of his trial testimony, recanting only that he saw defendant and Mitchell go inside Powers's apartment. Instead, Rogers now claims that he never saw defendant or Mitchell enter Powers's building, that one unknown black male entered, and that defendant was outside when Rogers heard the gun shots. Hankerson similarly attested, in relevant part, that he saw defendant and Mitchell standing across the street when an unknown male entered Powers's building, and that the unknown male later exited the building holding a gun.

¶ 26    In this appeal, defendant contends that the affidavits of Hankerson and Rogers are material because they "exonerate" him of the home invasion and murder since they establish that defendant did not enter the apartment building. This claim ignores the context of defendant's trial, as well as the fact that defendant was tried on an accountability theory, for the actions of Peoples, who was alleged to have been the actual shooter.

¶ 27    Importantly, defendant's claim that he was outside Powers's apartment at the time Campbell was shot was before the jury at defendant's trial. As set forth above, the evidence presented at trial included two statements given by defendant in which he claimed to have been outside Powers's apartment building at the time Campbell was shot. Specifically, Detective Halloran testified that during defendant's first interview, defendant admitted that on the evening of May 8, 2002, he and Mitchell encountered Peoples, who was looking to purchase drugs.

Defendant and Mitchell brought Peoples to Powers's home, because defendant knew she sold drugs. Defendant further stated that they knocked on the door, and that only Peoples went inside while defendant and Mitchell remained outside on the front porch. While Peoples was inside the hallway, defendant heard several shots being fired. Defendant, Mitchell, and Peoples then fled the scene. When Detective Halloran "confronted [defendant] with the fact that [Powers] implicated [defendant] as taking a far more active role in the home invasion and murder of [Campbell]," and that another witness said that defendant was inside the building at the time of the gunshots, defendant "denied that he went into the hallway."

¶ 28    During defendant's second interview, in the presence of his attorney, defendant admitted that "he sells drugs in that area" and that "that block is his block and that no one else sells drugs on that block." Defendant acknowledged that he, Mitchell, and Peoples went to Powers's house "to question her about the fact that they had learned that she was selling drugs in that area." Defendant continued to maintain, however, that only Peoples went into the hallway, and that defendant and Mitchell "stepped off the porch and walked three or four doors to the left of her home" to wait for Peoples. Defendant then stated that "a few moments later" he heard gunshots fired within Powers's home, and that he and Mitchell, and later Peoples, fled from the area. Again, after Detective Halloran questioned defendant about Powers's version of events, defendant persisted in denying "that he went into the hallway with the other subjects."

¶ 29    Based on the conflicting evidence on this point, defense counsel argued in closing that "what [defendant] was trying to tell the police over and over and over and over again" was more "logical" and "reasonable." Counsel acknowledged that there was "no doubt" that "Peoples did it," but asserted that defendant "didn't know. He didn't help. He wasn't conspiring." Counsel further argued, "Remember, [the prosecution] ha[s] to have this plan. Otherwise, they can't say

that [defendant]'s responsible for Christopher Peoples. That's why they have to put them all together. Because if they can't say this plan is real, or if you can't say this plan is real, then [defendant]'s not responsible. That's why the State says this plan is real.*** I don't know how this happened. Christopher Peoples knows how and why. [Defendant] doesn't."

¶ 30    The jury, however, apparently rejected defendant's version of events—specifically that he was outside the apartment building and that he was not aware of, and should not be responsible for, Peoples's conduct.

¶ 31    In these circumstances, the affidavits of Hankerson and Rogers do not provide anything new or create any new questions for the fact finder, and are cumulative of the evidence presented at trial. See *Ortiz*, 235 Ill. 2d at 333; *Williams*, 392 Ill. App. 3d 359, 369 (2009).

¶ 32    Moreover, taking the affidavits as true, as we must at this stage (see *Robinson*, 2020 IL 123849, ¶ 45), the affidavits do not negate defendant's criminal involvement in the home invasion and murder of Campbell. Defendant was never alleged to be the actual shooter, and instead was tried on a theory of accountability. As explained above, defendant attached himself to both Mitchell and Peoples, admitting that he went with Mitchell and Peoples to Powers's building to confront her about selling drugs. Although defendant stated that only Peoples entered the apartment building, defendant admitted that he and Mitchell waited outside for Peoples, and that they all fled the area after Campbell was shot. In light of the additional evidence presented at trial showing that their purpose was to rob Powers of drugs and money, defendant would remain criminally responsible for the home invasion and murder even if Peoples was the only one to enter the apartment. See *People v. Fernandez*, 2014 IL 115527, ¶ 13 ("[When] two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common

13

design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.")

¶ 33    The affidavits of Hankerson and Rogers confirm that defendant was at the scene with Mitchell and Peoples, and they provide no evidence showing that defendant did not engage in a common design with his codefendants such that he could not be found accountable for their actions. Accordingly, we cannot find the affidavits to be of such conclusive character that they would probably change the result on retrial. See *Robinson*, 2020 IL 123849, ¶ 47.

¶ 34    In light of the above, we cannot conclude that defendant "has raised the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence," or that the affidavits place "the trial evidence in a different light and undermine[ ] the court's confidence in the judgment of guilt." *Id.* ¶ 48. Accordingly, we affirm the trial court's denial of defendant's motion for leave to file a successive postconviction petition.

¶ 35    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36    Affirmed.