2024 IL App (1st) 230103-U

SECOND DIVISION
November 26, 2024

No. 1-23-0103

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03CR12481 |
| | ) | |
| MARCEL WHITE, | ) | Honorable |
| | ) | John F. Lyke, Jr. |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the trial court's denial of defendant's motion for leave to file a successive postconviction petition.

¶ 2    Defendant, Marcel White, was convicted of the May 8, 2002, home invasion and first-degree murder of Brian Campbell, and was sentenced to consecutive terms of imprisonment of 50 years for first degree murder plus a 15-year firearm enhancement, and 10 years for home invasion. In this appeal, defendant contends that the trial court erred in denying him leave to file a successive postconviction petition based on his claims that trial counsel was ineffective, and that he was denied due process based on the use of "fabricated evidence and coerced testimony" at his trial.

¶ 3      The facts elicited at trial have been extensively set out in prior appeals, and we will repeat that evidence only as much as relevant to this appeal.  In summary, defendant, James Mitchell, and Christopher Peoples were charged with the May 2002 shooting death of Brian Campbell. Peoples was alleged to have fired the weapon that killed Campbell, and defendant was charged on an accountability theory. At trial, the State argued that Campbell had been killed because defendant, Mitchell and Peoples were angry that Campbell and his wife, Ninner Powers, were selling drugs for a rival gang.

¶ 4      At trial, Powers testified that on the evening of May 8, 2002, she was shutting and locking the front door when defendant, Mitchell, and Peoples pushed the door open and entered. Powers had known defendant and Mitchell for about 20 years, but she was not familiar with Peoples. The men confronted Powers, accusing her of receiving money and drugs to sell for a rival gang, and demanded the money and drugs from her. When Powers denied the accusations, defendant said that he was going to go upstairs and find the drugs himself and told Mitchell that he should "go ahead and have [Powers] popped." Defendant went to the top of the stairs, kicked the door open and entered the apartment. Campbell came to the door at the top of the stairs, and Peoples fired three or four shots at him, striking him in the chest and in each leg. Powers further testified that after Peoples shot Campbell, Peoples put the gun to her head and pulled the trigger, but the gun was empty. Powers saw her husband's .38-caliber revolver on the floor nearby and took the weapon out of its case, at which point the three men fled.

¶ 5      When police arrived at the apartment to investigate the shooting, Powers told them the nicknames and addresses of defendant and Mitchell, and she described Peoples. Powers later identified photographs of the three men to police.

¶ 6    Antonio Rogers testified that he was going to a home across the street from Powers's residence on the night of the shooting. As he approached the home, Rogers encountered and spoke briefly to defendant and Mitchell, who he knew. Soon after, Rogers observed defendant, Mitchell and a third man standing on Powers's porch. Defendant, Mitchell and the third man went inside Powers's building, and Rogers heard a gunshot. Defendant and Mitchell emerged from the building, and Rogers heard defendant say to Mitchell, "Chris just shot dude" [*sic*]. Peoples then came out of the building, and defendant and Mitchell ran away from Peoples, who walked away from the building. Powers then came out of the building, screaming that her husband had been shot.

¶ 7    Chicago Police Officer Brian Pratscher testified that he interviewed Powers at her apartment immediately after the shootings, and Chicago Police Detective John Halloran testified that he and his partner, Detective James O'Brien, interviewed Powers that evening after she was transported to Area 1. Powers told the detectives the nicknames of defendant and Mitchell, and defendant's home address. Detective Halloran then looked up defendant and Mitchell in a computer database, and showed Powers their photographs. Powers confirmed that they were two of the offenders.

¶ 8    Detective Halloran also testified to two interviews he conducted with defendant a few days after the offense, one which occurred with, and the other without, defendant's attorney present. In the first interview, without defendant's attorney, defendant told the detective that Peoples was a heroin addict from the neighborhood, and that defendant and Mitchell had joined Peoples on the porch to "help [him] get drugs at that location." When Powers answered, only Peoples went inside, while defendant and Mitchell remained on the porch. Shots were fired inside the building, and when Peoples came out, the three men fled together. At that point, Detective Halloran told

defendant that Powers had implicated defendant "as taking a far more active role" in the home invasion and murder, and that a witness had seen three men enter the building together. Defendant again denied going inside.

¶ 9    In the second interview, conducted in the presence of defendant's attorney, defendant admitted that he was a gang member and that he sold drugs, and that he went to Powers's house with Mitchell and Peoples to confront her about selling drugs "on his block." Defendant continued to deny going inside the building or participating in the shooting.

¶ 10    The jury was instructed on three theories of murder—intentional, knowing and felony murder—and on the offense of home invasion. The jury was provided with general verdict forms. At the close of evidence, the jury convicted defendant of first-degree murder and home invasion. The jury also determined that a person for whom defendant was legally responsible was armed with a firearm.

¶ 11    Thereafter, defendant was sentenced to consecutive terms of imprisonment of 50 years for first degree murder plus a 15-year firearm enhancement, and 10 years for home invasion.

¶ 12    On direct appeal, this court affirmed defendant's convictions and sentence over several challenges. In particular, defendant claimed that (1) the denial of his counsel's challenges to three potential jurors for cause denied him a fair trial; (2) the prosecution introduced improper evidence of his criminal record and made various improper remarks during closing argument; (3) his trial counsel was ineffective for failing to move to suppress his statement made without his attorney present and also for not requesting separate jury verdicts for the alternate counts of murder in the indictment; (4) his 65-year sentence for murder was excessive; (5) the 15-year statutory sentence enhancement could not be applied in his case because he did not hold the weapon; and (6) he was entitled to a new trial because the jury was instructed on three theories of murder, including felony

murder, and due to the use of general verdict forms, the jury could have convicted him on the theory of felony murder, of which home invasion is a lesser included offense. *Id.*

¶ 13 On April 7, 2010, defendant filed a *pro se* post-conviction petition, claiming ineffective assistance of trial and appellate counsel, and that the State used perjured testimony. In particular, defendant asserted that trial counsel was ineffective for failing to move to suppress statements he made to Detective Halloran. Defendant also asserted that he "turn[ed] [him]self in and was accompanied by [his] attorney" for one of those statements, and that counsel was ineffective for failing to investigate and contact that attorney to determine if he "could have contradicted De[te]ctive Halloran[']s testimony." Defendant contended that he asked his trial counsel to investigate and call the attorney, but counsel "refused."

¶ 14 On July 2, 2010, the trial court summarily dismissed the petition, finding it to be frivolous and patently without merit. Appointed appellate counsel filed a *Finley* motion to withdraw, which this court granted. *People v. White*, 2011 IL App (1st) 102471-U.

¶ 15 On March 30, 2018, defendant filed a *pro se* motion for leave to file a successive post-conviction petition, as well as a successive petition. The petition alleged: (1) actual innocence based on newly discovered evidence; and (2) that the State committed a *Brady* violation by failing to disclose that Antonio Rogers initially gave police a statement inconsistent with his trial testimony.

¶ 16 In support of defendant's motion, defendant presented the affidavits of two individuals, Ranceallen Hankerson and Antonio Rogers. In Hankerson's affidavit, he attested that at the time of the offense, Hankerson saw defendant outside the apartment on the street, while an unknown male went inside Powers's apartment, and came back outside holding a small silver gun.

¶ 17    In Rogers's affidavit, he stated that, in his interview with Detective Halloran and another detective, he told them that on the day that Campbell was shot and killed, he had been talking to defendant because defendant was trying to sell him drugs. Rogers was on a porch across the street when he saw a woman coming out of Powers's apartment and, a minute or so later, he saw a black male who he did not know enter Powers's apartment building. At the time, Rogers was outside with defendant and Mitchell. At no time did Rogers see anyone other than the unknown black male enter Powers's apartment. Rogers also averred that he began walking home as soon as he heard gunshots. As Rogers was walking away, defendant was walking west towards Peoria Street. Rogers stated that he told Halloran this information at his initial interview but had to change his story because Halloran said that Rogers was lying and that he would be charged with perjury. Rogers stated that he was addicted to drugs and did not want to go to jail, so he provided the story given to him by Halloran and made the false statement in which he placed defendant and Mitchell inside the apartment at the time of the murder. Rogers averred that he also testified falsely because he was afraid that Halloran would send him to jail if he "did not tell the false story [Halloran] gave" Rogers. Rogers further stated that after he testified, Rogers left Illinois for ten years and provided the affidavit to defendant's mother when he moved back.

¶ 18    On August 2, 2018, the trial court denied defendant leave to file his successive petition, finding that he failed to set forth a colorable claim of actual innocence and failed to demonstrate cause and prejudice to assert a *Brady* claim.

¶ 19    On appeal from that denial, defendant abandoned the argument claiming a *Brady* violation for the State's alleged failure to disclose Rogers's initial statement, contending only that he presented a colorable claim of actual innocence based on the affidavits of Hankerson and Rogers. *People v. White*, 2021 IL App (1st) 182112-U, ¶ 17. This court affirmed, finding that the affidavits

were cumulative of evidence presented at trial and that they were not of such a conclusive character that they would probably change the result on retrial. *Id.*, ¶ 33.

¶ 20    This court explained that the affidavits of Hankerson and Rogers "provide[d] that defendant did not personally enter the apartment building where the victim was shot." *Id.*, ¶ 25. However, defendant's claim that he was outside Powers's apartment at the time Campbell was shot was before the jury at defendant's trial, including in the defense's closing argument, and the jury had rejected that claim. *Id.*, ¶ 30. In particular, the evidence at trial included defendant's two statements to Detective Halloran, in which he admitted that he, Mitchell and Peoples went to Powers's home, but he denied that he went inside. In the second interview, which was conducted in the presence of defendant's attorney, defendant acknowledged that he sold drugs and that he, Mitchell, and Peoples went to Powers's house to confront her about information that she was selling drugs in the same area. Defendant continued to maintain, however, that only Peoples went into the hallway, and that defendant and Mitchell were a short distance from the home when he heard gunshots. Accordingly, this court found that the affidavits of Hankerson and Rogers did "not provide anything new or create any new questions for the fact finder, and are cumulative of the evidence presented at trial." *Id.*, ¶ 31.

¶ 21    Additionally, this court found that, even taking the affidavits as true, the affidavits did not "negate defendant's criminal involvement in the home invasion and murder of Campbell" where defendant was "never alleged to be the actual shooter, and instead was tried on a theory of accountability." *Id.*, ¶ 32. Based on evidence presented at the trial that defendant, Mitchell and Peoples shared a common purpose "to rob Powers of drugs and money, defendant would remain criminally responsible for the home invasion and murder even if Peoples was the only one to enter the apartment." *Id.* We noted that the affidavits "confirm[ed] that defendant was at the scene with

Mitchell and Peoples, and they provide[d] no evidence showing that defendant did not engage in a common design with his codefendants such that he could not be found accountable for their actions." *Id.*, ¶ 33. Accordingly, the affidavits were not "of such conclusive character that they would probably change the result on retrial." *Id.*

¶ 22     Thereafter, on September 19, 2022, defendant filed a second motion for leave to file a successive postconviction petition, which is at issue in this case. Defendant raised two issues (1) that his counsel provided ineffective assistance by failing to cross-examine Detective Halloran with "available evidence" that showed a pattern of criminal activity for fabricating confessions, threatening and abusing suspects, and coercing witnesses; (2) that there existed "newly discovered evidence," in the form of an "affidavit from Antonio Rogers who recant[ed] his trial testimony." As to the second issue, defendant cited both the actual innocence standard, and contended that his rights to due process, equal protection, and to "exculpatory evidence" were violated due to Detective Halloran's falsifying evidence, causing witnesses to testify falsely, and withholding exculpatory evidence. Although the affidavit of Rogers was the same as the same as the one which had been previously attached to defendant's first motion for leave to file a successive post-conviction petition in 2018, defendant asserted that he was not foreclosed from bringing a renewed claim based on the affidavit because he presented newly discovered additional evidence—Detective Halloran's pattern of criminal activity—in support.

¶ 23     Defendant also attached his own affidavit, in which he stated that

> "before Detective Halloran testified against me, my trial counsel Ms. Majorie Placek informed me that Halloran claim[ed] I made two verbally [*sic*] confession[s]. Ms. Placek informed me that what Halloran claims wasn't part of the original discovery.  I told Ms. Placek that I never talk[ed]

to Detective Halloran or no other detectives making no verbal confession on May 11 and 12, 2022 involving myself in no crime. I told Ms. Placek Halloran [was] making false statements against me. Afterward Halloran testified."

¶ 24    Defendant also attached various legal complaints against members of the Chicago Police Department, including Detective Halloran, reports regarding complaints against officers, and a chart purporting to outline "Abuse Allegations" made by various individuals against various officers including physical abuse, "coerc[ed] statement[s]" and "false confession[s]."

¶ 25    Finally, defendant also supported his motion for leave to file a second successive post-conviction petition with the Rule 23 order entered in an appeal involving his codefendant, Christopher Peoples. *People v. Peoples,* 2020 IL App (1st) 161068-U (Unpublished Order under Supreme Court Rule 23). In that case, a divided panel of the appellate court reversed the second stage dismissal of  Peoples's initial postconviction petition, finding that the petition "state[d] the gist of a claim for ineffective assistance of counsel" where the allegations and evidence in the petition "show[ed] a pattern and practice of fabricating evidence to obtain criminal convictions against the victims of crimes committed by the police." The panel found that Peoples had sufficiently shown that his trial counsel acted unreasonably in failing "impeach Halloran with available evidence of Halloran's crimes," and that such failure prejudiced Peoples.

¶ 26    On December 2, 2022, the circuit court entered an order denying defendant leave to file his successive postconviction petition. The court characterized defendant's claims as for "actual innocence" and "ineffective assistance of counsel." The court found that defendant's actual innocence claim  failed as it was not newly discovered or conclusive, and that defendant's claim of ineffective assistance of counsel was barred by *res judicata* and meritless.

¶ 27    In particular, the court explained that the case involving Peoples was not analogous to that of defendant. In concluding that the defendant in *Peoples* had sufficiently alleged ineffective assistance of counsel for failure to impeach Detective Halloran's testimony that Peoples confessed to participating in the murder, the appellate court described the case against *Peoples* as "exceptionally thin." *Peoples,* 2020 IL App (1st) 161068-U, ¶ 20. In particular, Powers did not know Peoples at all, and Peoples did not match Powers's initial description of the shooter. Additionally, Peoples presented his own alibi testimony, which was corroborated by three other witnesses, at trial.

¶ 28    The trial court explained that, unlike the case against Peoples, the case against defendant "was based on much more than Detective Halloran's testimony." Powers identification of defendant was much stronger than her identification of Peoples, where Powers had "extreme familiarity" with defendant having known him for 20 years. Moreover, multiple eyewitnesses placed defendant at the scene of the crime, including defendant, who acknowledged his presence. Accordingly, the court concluded that even if defendant's trial counsel could have impeached Detective Halloran with his "pattern of practice of coercing confessions," it would not "create a reasonable probability that the outcome of [defendant]'s trial would have been different." Consequently, the court found that defendant could not show cause for his failure to bring this claim earlier, nor prejudice arising therefrom. The trial court denied defendant's motion for leave to file his second successive postconviction petition, and defendant timely appealed.

¶ 29    In this court, defendant contends that the trial court erred in denying him leave to file his successive postconviction petition. He asserts that he adequately alleged claims that he received ineffective assistance of counsel based on trial counsel's failure to impeach Detective Halloran "with evidence of crimes that Halloran committed as a Chicago Police Detective," and that

defendant's "right to due process was violated by the introduction of fabricated evidence and coerced testimony against him."

¶ 30    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2020)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Only one postconviction proceeding is contemplated under the Act (*People v. Edwards*, 2012 IL 111711, ¶ 22), and a defendant seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). The bar against successive postconviction proceedings should not be relaxed unless (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22-23; *People v. Smith*, 2014 IL 115946, ¶ 30. Under the cause and prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)).

¶ 31    The cause and prejudice standard is higher than the normal first stage "frivolous or patently without merit" standard applied to initial petitions. *Id.* ¶¶ 25-29; *Smith*, 2014 IL 115946, ¶ 35. "A defendant shows cause 'by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *People v. Wrice*, 2012 IL 111860, ¶ 48 (quoting 725 ILCS 5/122-1(f) (West 2010)). In other words, to establish "cause" a defendant must articulate why he could not have discovered the claim earlier through the exercise of due diligence. *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 72. A defendant shows prejudice by demonstrating that the claim so infected the trial that the resulting conviction or

sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48. It is defendant's burden to establish a *prima facie* showing of both cause and prejudice in order to be granted leave before further proceedings on his claims can follow. See *People v. Bailey*, 2017 IL 121450, ¶ 24.

¶ 32    As with an initial postconviction filing, in considering a motion for leave to file a successive petition, all well-pleaded facts and supporting affidavits are taken as true. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25. Leave to file a successive petition should be denied where it is clear, from a review of defendant's petition and supporting documentation, that his claims fail as a matter of law or where the successive petition and supporting documentation are insufficient to justify further proceedings. *People v. Smith*, 2014 IL 115946, ¶ 35. We review *de novo* the trial court's denial of leave to file a successive petition. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 33    Defendant first contends that the circuit court erred in denying him leave to file his successive postconviction petition where he made a *prima facie* case of cause and prejudice for his claim that his trial counsel was ineffective for failing to "investigate and present evidence of Detective Halloran's prior acts of misconduct" to impeach his credibility.

¶ 34    The State initially responds that defendant cannot show cause for failing to raise the claim in his initial petition because it is based on information that was available to defendant prior to the filing of his first postconviction petition. Specifically, the State points to several newspaper articles detailing Detective Halloran's alleged abusive and coercive interrogation tactics that were published prior to defendant filing his first post-conviction petition. Defendant, however, asserts that he did not have access to this information until "he learned of this Court's decision in *People v. Peoples*, 2020 IL App (1st) 161068-U," involving his codefendant, which set out "the criminal acts of the Chicago Police Detectives."

¶ 35   We need not resolve whether defendant can show cause for his failure to raise the issue, because we find that defendant's claim of ineffective assistance is meritless, and he cannot establish prejudice from the failure to raise it. See *People v. Montanez*, 2023 IL 128740, ¶ 120; *Smith*, 2014 IL 115946, ¶ 37 (where "defendant failed to satisfy the prejudice prong of the cause-and-prejudice test, *** we need not address defendant's claim of cause.").

¶ 36   Defendants have a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 11746, ¶ 23 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Specifically, the defendant must demonstrate "that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 36.

¶ 37   In deciding whether counsel's performance was deficient, the defendant must overcome a "strong presumption" that his lawyer's conduct constitutes sound trial strategy and falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. A defendant is entitled to competent, not perfect, representation. *People v. Odle*, 151 Ill. 2d 168, 173 (1992). Generally, the decision about what evidence to present is a strategic one. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. Although "[a]ttorneys have an obligation to explore all readily available

sources of evidence that might benefit their clients" (*People v. Morris*, 335 Ill. App. 3d 70, 79 (2002)), "the reasonableness of a decision to investigate is assessed applying a heavy measure of deference to counsel's judgment." *People v. Orange*, 168 Ill. 2d 138, 149 (1995). An attorney who forgoes further investigation is not ineffective "[w]here the circumstances known to counsel at the time of his investigation do not reveal the sound basis for further inquiry in a particular area." *Id.* at 150. Whether trial counsel was ineffective for failing to investigate is generally determined by comparing the strength of the trial evidence with the value of the evidence allegedly not presented at trial. *People v. Clark*, 2011 IL App (2d) 100188, ¶ 24.

¶ 38    Moreover, counsel's decisions regarding how or whether to impeach a witness is generally considered a matter of trial strategy and will not support a claim of ineffective assistance of counsel. *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997); *People v. Salgado*, 263 Ill. App. 3d 238, 246 (1994). Where counsel completely fails to use significant impeachment evidence to impeach a key witness, such conduct may not be sound strategy and may constitute ineffective assistance. *Salgado*, 263 Ill. App. 3d at 246–47. A defendant may rebut the presumption of trial strategy by showing that counsel's failure to impeach a witness was so unreasonable that no effective defense attorney would have pursued the strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 39    Defendant argues that he sufficiently asserted a claim of ineffective assistance of counsel based on his averment that he "did not make" the statements Detective Halloran testified that he made, and that counsel's "failure to impeach him with evidence of his crimes undermined confidence in the outcome of his trial." Defendant maintains that the documents attached to his petition show that Detective Halloran "was willing to break the rules and obtain confessions and identifications through coercive means," and that counsel should have impeached Detective Halloran with this evidence, where his testimony "placed [defendant] at the scene," corroborated

14

the testimony of Rogers and Powers, and introduced defendant's acknowledgment that he "went to Powers's house to confront her about selling drugs."

¶ 40    The State responds that the documents attached to defendant's petition do not support a claim of ineffective assistance of counsel because he presents no evidence that counsel did not conduct the investigation that defendant contends should have occurred. And, in any event, there is no evidence that the information would have been available to counsel at the time of defendant's trial, where most of the documents attached to defendant's petition were prepared or created after that time.

¶ 41    We agree with the State that defendant has presented no evidence to support his contention that the absence of impeachment was based on counsel's failure to investigate, rather than a strategic choice, or that a reasonable investigation could have uncovered the evidence defendant now contends should have been used. Without any such evidence, we must presume that counsel's performance falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

¶ 42    More importantly, however, we find a much more fundamental flaw in defendant's claim in this appeal, as it is based on a mischaracterization of the testimony provided by Detective Halloran. Underlying defendant's challenge is the suggestion that Detective Halloran testified at trial regarding defendant's "confessions" to his involvement in the offense, and that defendant's trial counsel should have impeached that testimony with evidence suggesting that the detective fabricated those statements. Detective Halloran, however, never testified that defendant confessed. Instead, Halloran testified that defendant acknowledged being at the scene of the offense, but that he denied going inside the apartment and participating in the offense—a version of event that defendant maintained consistently throughout trial and in his postconviction proceedings.

¶ 43 Specifically, defendant avers in his affidavit that he learned before trial that Halloran "claim[ed] [defendant] made two verbally [*sic*] confession[s]" and that defendant told his trial counsel that he "never talk[ed] to Detective Halloran or no other detectives making no verbal confession on May 11 and 12, 2022 involving [him]self in no crime." Based on this affidavit, defendant contends that "Halloran manufactured and testified falsely about [defendant's] inculpatory oral statements at trial." Defendant further claims that the documents attached to his petition show that his counsel should have investigated Detective Halloran, and impeached him with evidence regarding his pattern and practice of fabricating evidence and coercing testimony and confessions, explaining that a "confession is probably the most probative and damaging evidence that can be admitted against" a criminal defendant.

¶ 44 It is unclear from defendant's affidavit whether he is now contending that he did not speak to Detective Halloran at all, or if he is maintaining that he did not "confess[ ]" to "involving [him]self" in a crime. If defendant is asserting that he did not speak to Detective Halloran, it is inconsistent with his prior averments. Specifically, in defendant's 2010 post-conviction petition, defendant asserted that he had "turn[ed] [him]self in" and was accompanied by his attorney for one of his statements to Detective Halloran, and that his counsel was ineffective for failing to investigate and contact that counsel to determine if he could have contradicted Detective Halloran's testimony.

¶ 45 In defendant's reply brief, he clarifies that he is not maintaining that he "never spoke with any detective whatsoever," but instead that he "never made a verbal confession to Halloran or other detectives." Defendant, however, does not contend that Detective Halloran coerced his statements, nor does he identify any particular testimony by Detective Halloran that was inaccurate. To the contrary, the bulk of Detective Halloran's testimony is consistent with what

defendant has maintained both during his trial and throughout his various postconviction proceedings—that he is not guilty of the offense because, although he was present at the scene, he did not go inside the building and he did not know that Peoples would shoot Campbell. In closing arguments at trial, defense counsel used the testimony of Detective Halloran to argue that defendant told the detective "over and over and over again" that he was at the scene but that he did not participate in the offense, and that defendant's version of events was more "logical" and "reasonable" than that of the State. Thereafter, in defendant's motion for leave to file a first successive postconviction petition, defendant asserted an actual innocence claim based on the affidavits of Hankerson and Rogers, both of whom attested that, at the time of the offense, they saw defendant outside Powers's apartment, while an unknown male went inside. In defendant's motion, he asserted that he did not give a "statement which ma[de] him accountable for the shooter['s] conduct," that his "pretrial statements [we]re not inherently inculpatory," and that his "defense was he never was involved, [and] never entered the apartment building."

¶ 46    In these circumstances, defendant can show neither deficient performance on the part of his trial counsel, nor prejudice arising therefrom, based on trial counsel's failure to impeach Detective Halloran, where Detective Halloran's testimony provided the main support for the defense's strategy. Because defendant's ineffective assistance claim is factually and legally meritless, we also find that defendant has not shown prejudice stemming from his failure to raise the claim earlier. *People v. Smith*, 341 Ill. App. 3d 530, 544 (2003) ("where the underlying claim of ineffective assistance has no merit, we may also find that no prejudice resulted for purposes of the cause and prejudice test.").

¶ 47    We next turn to defendant's second issue raised in his motion for leave to file a successive petition. In defendant's motion, he characterized his challenge as a claim based on "newly

discovered evidence [in the form of] an affidavit from Antonio Rogers who recant[ed] [his] trial testimony." Defendant cited the actual innocence standard, as well as his rights to due process, equal protection, and "exculpatory evidence." In ruling on defendant's motion for leave to file a successive petition, the trial court construed the second issue as a claim of actual innocence.

¶ 48    In this appeal, however, defendant abandons any claim of actual innocence, and instead frames the second issue as a claim that his "right to due process was violated by the introduction of fabricated evidence and coerced testimony." Defendant acknowledges that the claim is based on the same affidavit as in his prior successive petition, but maintains that he is "not simply rais[ing] the same claim of actual innocence based on Rogers's affidavit." Instead, defendant contends that he is raising a due process claim "based on state action–Detective Halloran's pattern and practice of falsifying evidence, coercing witnesses to falsely testify and withholding exonerating evidence." Although the trial court did not review defendant's due process claim, this court reviews a trial court's ruling concerning leave to file a successive petition *de novo*. *People v. Dorsey*, 2021 IL 123010, ¶ 33. We may affirm on any basis supported by the record. *Johnson*, 208 Ill. 2d at 128-29

¶ 49    It is well settled that the "State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process." *People v. Smith*, 352 Ill. App. 3d 1095, 1101 (2004); see also *People v. Washington*, 171 Ill. 2d 475, 487 (1996) ("the use of false testimony underlying a conviction is a due process violation."). In order to establish a due process violation, the prosecutor trying the case need not have known that the testimony was false; knowledge on the part of any representative or agent of the prosecution, including the police, is sufficient. *Smith*, 352 Ill. App. 3d at 1101. If a defendant is able to prove that the State presented perjured testimony, "the trial court must decide whether the perjured testimony was a significant factor at defendant's

trial and whether such evidence provided any reasonable likelihood that the jury's verdict was affected by the perjured testimony." *Id.* at 1113, citing *Coleman*, 183 Ill.2d at 392.

¶ 50    Initially, defendant contends that although Rogers's affidavit was attached to his prior successive petition, he can show cause for the failure to bring the claim earlier where he provided new evidence supporting the claim that the investigating detectives engaged in a pattern and practice of misconduct. The State, however, contends that defendant cannot show cause for his failure to raise a due process claim earlier where he was "aware of his claim that Det[ective] Halloran coerced [Rogers] to testify falsely when he filed his first successive post-conviction petition which included [Rogers]'s affidavit to that effect."

¶ 51    Defendant relies on the supreme court's decision in *People v. Blalock*, 2022 IL 126682, to contend that newly discovered evidence of the misconduct that specifically implicates the interrogating officers in the case constitutes cause under the Act. The defendant in *Blalock* claimed that his inculpatory statement to the detective was the result of physical coercion, including detectives choking defendant until he passed out and urinated on himself, and "split[ting] defendant's pinkie nail until it bled." *Id.,* ¶ 31. The defendant also averred that he was "repeatedly hit, slapped, and kicked," and that one detective "put his gun to defendant's head and threatened to kill him." *Id.,* ¶ 32. Defendant attached to his petition "newly discovered evidence of a pattern and practice of misconduct" by the detectives to support his claim that "his inculpatory statement was the result of police abuse and coercion." *Id.,* ¶ 29.

¶ 52    The trial court denied defendant leave to file his successive postconviction petition, and the appellate court affirmed, finding that the "factual basis of a claim of a coerced confession is always known to a defendant," and accordingly, that subsequent evidence of police misconduct does not establish cause, and a coerced confession claim can therefore never be raised in a

successive postconviction petition. *Id.,* ¶ 41. The supreme court disagreed, relying on cases holding that evidence of a pattern and practice of police misconduct is part of the factual basis of a coerced confession claim and that its prior unavailability can establish cause for purposes of a successive postconviction petition. *Id.* ¶ 45. Nevertheless, the supreme court found that the defendant could not establish the prejudice standard where his coerced confession claim was inconsistent with his trial testimony that "he fabricated his statement merely to appease the detectives and assistant state's attorney because they would not accept his version of events" and not "because of physical abuse." *Id.* ¶ 49.

¶ 53    Unlike in *Blalock*, defendant has made no claim that his statements to Detective Halloran were coerced, and, as explained above, those statements cannot be characterized as "confessions," especially where they are largely consistent with the version of events that defendant argued at trial and since. And although Rogers's affidavit suggests that the portion of his statement placing defendant inside the apartment at the time of the offense was coerced by Detective Halloran, this court previously considered that affidavit in our 2021 Rule 23 order, concluding that, even taking the averments in the affidavit as true, they did not negate defendant's criminal involvement in the offenses. *White*, 2021 IL App (1st) 182112-U, ¶ 32.

¶ 54    In these circumstances, the evidence attached to defendant's successive petition does not provide support for his claim, and we can find neither cause nor prejudice from his failure to raise the claim earlier. Even if we assume that defendant could prove that the Rogers's testimony was coerced as to whether defendant was inside the apartment or on the porch, we could not find that testimony to be a "significant factor at defendant's trial" or that it "provided any reasonable likelihood that the jury's verdict was affected by the perjured testimony." *Smith*, 352 Ill. App. 3d at 1101.

¶ 55   For the foregoing reasons, the trial court properly denied defendant's request for leave to file a second successive post-conviction petition, and we affirm that judgment.

¶ 56   Affirmed.